WARREN SPARROW ET AL. *v.* JOSEPH CIMONETTI ET AL.

(58 A2d 875)

February Term, 1948.

Present: MOULTON, C. J., SHERBURNE, BUTTLES, STURTEVANT and JEFFORDS, JJ.

Opinion filed May 4, 1948.

*Waldo C. Holden* for the defendants.

*Leonard W. Morrison* for the plaintiffs.

MOULTON, C. J.   On October 31, 1946, the parties to this cause entered into a written agreement for the conveyance of certain land in the town of Stamford by the defendants to the plaintiffs.   The defendants have refused to execute the required deed, and this proceeding in equity has been brought to obtain specific performance. The answer alleges that the agreement was entered into under a mistake and asks for affirmative relief by way of rescission.   After hearing and filing findings of fact the chancellor entered a decree for the plaintiffs.   The cause is before us on the defendants' exceptions to the findings and to the refusal of the chancellor to find as requested by them.

The agreement, which appears as a part of the complaint, is admitted by the answer and is contained in the findings of fact, recites that the respective parties own adjoining parcels of land; that there had arisen a dispute between them concerning the boundaries between their properties; that as a result of this dispute an action for a declaratory judgment, brought by the plaintiffs, is pending in the Bennington County Court; and that the agreement is made in view of the foregoing and the wish of the parties to settle the controversy without resort to litigation.   It is therein provided that there shall be fifty acres of land in the Cimonetti parcel; that the boundaries thereof shall be determined by a survey, to be made by the office of Mr. M. J. Burrington, a civil engineer of Bennington, at the expense of the plaintiffs; that the survey shall start at the northwest corner of the parcel of land described in the deed by which the defendants obtained their title. The instrument then proceeds as follows: "(4) that the first bounds to be traced by the surveyor shall run from the said northwest corner along the fence as it is now established to the brook which leads to the Hubbard Brook; that the course of the west and south lines of the Cimonetti's shall follow the course of the Hubbard Brook to the point where it crosses the highway; thence in a general northerly direction along the west line of the highway to a point opposite and in line with the line between the lands of Tetreault and Sanford; that the line shall then turn in a general westerly direction and northerly direction to be plotted out by the surveyor so as to include a total of fifty acres within the four bounds.   (5) The east and north lines of the Cimonetti parcel are to be set by the surveyor with a view to including fifty (50) acres therein.   To accomplish this the surveyor is to run a line in an

easterly direction from the starting point along the south line of the Baptist Church Lot and the extension thereof and shall set the perimeter of the property occupying the west and south lines as they are now determined to be with a view to setting out a parcel of land fifty (50) acres in size. (6) The parties may meet with the surveyor and point out to him the land marks and bounds. (7) The surveyor shall prepare a map of the Cimonetti lot and the boundaries as determined by him shall be binding on both parties and each party shall quitclaim to the other within ten days following the completion of the map the lands which the surveyor has assigned to the other. (8) That the parties shall also exchange general releases and the action now pending in the County Court at Bennington shall be discontinued without costs."

It appears from the findings of fact that the defendants' land lies west and south of the land of the plaintiffs and that before the defendants purchased their parcel there had been a dispute between the plaintiffs and the defendants' grantors with regard to the boundary between their respective properties. When the defendants purchased their land the defendant Joseph Cimonetti was shown by Stebbins, one of his grantors, what the latter claimed to be its boundaries and was informed that it contained fifty acres more or less, which he understood to mean not less than fifty acres nor more than sixty acres. While the action for a declaratory judgment was pending, in October, 1946, the plaintiff Warren Sparrow and the defendant Joseph Cimonetti, with their respective attorneys met upon the land in question. Stebbins and two other persons were also present. It was there agreed in substance that a survey should be made to establish the disputed boundary so that the defendants would have fifty acres of land in their parcel, which was what Cimonetti said he wanted. His attorney warned him that he might be disappointed at the outcome of the agreement. The plaintiffs' attorney drew a rough sketch of what would be the Cimonetti parcel which the parties examined and discussed. At that time the parties did not know where the boundary would be located in order to give the defendants fifty acres of land, or how much would be left in the plaintiffs' parcel after giving fifty acres to the defendants. After this conference the written agreement was prepared, signed by the plaintiffs and two copies were sent to the defendants by their attorney. The defendants are not well educated and cannot read English too well. They kept the agreement for two or

three weeks. Joseph Cimonetti looked it over and consulted Stebbins who said, in substance, that he saw nothing wrong with it. Thereupon Joseph told Ida, his wife, that Stebbins said that it would be all right to sign it, and both did so and returned the instrument, upon which the action for a declaratory judgment was discontinued.

Joseph Leonesio, a surveyor employed by Burrington, met Warren Sparrow and Joseph Cimonetti on the land, and started his survey at the northwest corner of the Cimonetti parcel which was marked by a large stone and proceeded southwards from that point along the established fence to the brook leading to the Hubbard Brook and along the course of that brook and of the Hubbard Brook to the point where the latter stream crosses the highway, and then in a northerly direction along the west line of the highway to a point opposite to and in line with the boundary between the lands of Tetreault and Sanford, which was pointed out to him by Tetreault and was marked by a stone wall. The surveyor then extended this line in a westerly direction, but Cimonetti claimed that it should be placed farther to the north and left the surveyor and Sparrow to go on alone. Thereafter, from the notes made as the survey had thus far progressed a computation was made by John G. Hutton of the Burrington office, so as to give the defendants fifty acres of land, exclusive of highways, by a westerly extension of the Tetreault-Sanford line, as the southerly boundary of the plaintiffs' parcel, and then northerly to the northerly line of the defendants' property to a point opposite the northeast corner, at which the survey had been started. A pencil map was prepared by Mr. Hutton and the survey completed in accordance with it and the computation. Mr. Hutton, who had previously surveyed land in the same locality, checked the northwest corner of the defendants' land at the starting point and found it correct of his own knowledge. After exactly 50 acres, exclusive of highways, had been set off to the defendants it appeared that the plaintiffs' parcel was considerably larger than the acreage given in the deed by which they obtained title, which was "estimated to contain 16 acres more or less." Defendant Joseph Cimonetti was not satisfied with the survey because of the location of his fifty acres which excluded a road which he had formerly used for access to his land and because the plaintiffs thereby obtained more than sixteen acres as their parcel.

Mutual quitclaim deeds were drawn, the plaintiffs executed

one to the defendants for delivery to them, and the other was submitted to the defendants for execution on their part. The defendants have refused to sign or deliver it, or to carry out their part of the agreement. The plaintiffs have offered to deliver their deed upon receipt of defendants' deed and are ready and willing to do so. The plaintiffs have paid for the survey and map as provided in the agreement.

The findings conclude in these words: "I am unable to find by the requisite measure of proof that there was any mutual mistake or mistake on the part of the defendants in regard to the terms, conditions or stipulations embraced in the agreement signed by the plaintiffs and defendants in regard thereto or that the plaintiffs practiced any fraud, deceit or imposition upon the defendants in regard thereto or that the defendants were under any mistake that occurred through no fault of either party to the agreement or that the defendants were under any mistake that occurred through no fault of the plaintiffs but through the negligence and inattention of the defendants. On the contrary, I am satisfied and find that the defendants had ample opportunity to understand and find out the terms and conditions of the agreement before signing the same and in signing the same they acted through no compulsion; that their reason for signing the same was to settle the litigation then pending and the dispute between the parties in regard to their common boundary lines and that the only dissatisfaction in connection with the establishment of said common boundary lines in accordance with said agreement as far as the defendants are concerned is that the survey establishing the same and giving the defendants the fifty acres which they wanted did not locate the entire parcel of the defendants as they thought it should be located and that it gave the plaintiffs more land in their parcel than the defendants felt they should have."

An exception was taken to the finding that the survey was commenced at the northwest corner of the Cimonetti land, on the ground of lack of supporting evidence. A finding must stand if there is legitimate evidence fairly and reasonably tending to sustain it; if this is so, the fact that the evidence is conflicting cannot avail the excepting party, for all conflicts must be resolved against him on review; and the weight of the evidence and the credibility of the witnesses are for the trier of the facts to determine, and so, if he finds certain of the testimony to be implausible, it is not for

us to revise his judgment thereon. *Taylor* v. *Henderson,* 112 Vt 107, 111, 22 A2d 318; *Harrison* v. *Harrison,* 110 Vt 254, 257, 4 A2d 348; *Utley* v. *School District,* 110 Vt 522, 526, 9 A2d 117; *Village of St. Johnsbury* v. *Cenedalla,* 109 Vt 174, 181, 194 A 382; *White River Chair Co.* v. *Conn. River Power Co.,* 105 Vt 24, 35, 162 A 859; *Handy* v. *Trudell,* 104 Vt 85, 86, 156 A 902.

■ There was evidence tending to show that the corner was pointed out to Leonesio, the surveyor, although by whom does not appear, but Joseph Cimonetti and his grantor, Stebbins, were present. Cimonetti testified that he made no objection to the starting point and that the survey was commenced at his northwest corner. It is true that he also testified that he did not know that it was the starting point, but it was for the trial court to decide which of his conflicting statements was to be accepted. *Wakefield* v. *Champlain Marine Co.,* 111 Vt 243, 244, 13 A2d 183, and cases cited; *Gomez* v. *Lawson,* 105 Vt 353, 357, 166 A 14; *McDonald* v. *McNeil,* 92 Vt 356, 361, 104 A 337. Furthermore, a fence ran southward from the large stone, which the chancellor found to mark the corner, and it was open to the chancellor to conclude that this was the fence "as it is now established" specified in the agreement to be the first course of the survey. The finding was supported by the evidence and the exception is not sustained. What has been said disposes also of an exception to the refusal to comply with defendants' request that the chancellor should state that he was unable to find that "the starting point (of the survey) was in fact as the agreement specified."

Another exception was taken to the finding that the surveyor, Hutton, checked the corner and found it correct from his own knowledge. In this instance the lack of evidentiary support is claimed to appear in an answer given by Hutton on cross-examination by defendants' counsel, that he had never seen the deed by which the Cimonetti's took their title and could not say as a fact whether or not the corner at which the survey was commenced was in fact the north west corner of the Cimonetti parcel. But he testified that he had previously surveyed the lot adjoining the Cimonetti property on the west, the northeast corner of which was co-incident with the Cimonetti's northwest corner; that he had had occasion to determine this corner and in the course of his survey had noted where it was situated; and that he checked Leonesio's notes against his own survey and found that the corner as fixed

by the latter agreed with his own knowledge. In view of this evidence we cannot say that the finding was unwarranted. The exception is unavailing.

■ An exception was taken to the finding that during the visit of the parties and their attorneys to the land, the plaintiffs' attorney drew a rough draft of what was to be the Cimonetti parcel, which the parties looked over and discussed. This is inadequately briefed, since all that is said concerning it is merely a repetition of the grounds stated in taking the exception, and therefore it does not merit our consideration. *State* v. *Schwarzchild,* 112 Vt 167, 172, 22 A2d 177; *Flint* v. *Davis,* 110 Vt 401, 404, 8 A2d 671. However, the transcript shows that the finding is supported by the testimony of the defendants' attorney, and Cimonetti, in his own testimony, did not deny the facts contained therein.

The defendants requested the chancellor to state that he was unable to find that the map provided for in the agreement was completed ten days before they were requested to execute a quitclaim deed to the plaintiffs, as the contract required. It is claimed that the map was not prepared until May, 1947, although the deed was demanded during the previous December. The evidence tended to show that a map was drawn by Hutton within a few days after Leonesio submitted the notes of his survey to his associate. A tracing and print of this map were made in May, and the print was used at the trial as an exhibit. Although this print was then referred to as the map called for by the agreement, it is only a copy of the original map. The request was properly refused.

■ Another request, to the refusal of which an exception was taken, was that the sole cause of the boundary dispute was that Sparrow thought that he was entitled to more than seventeen acres of land because his deed specified his lot to contain sixteen acres more or less; and that there were no monuments marking his claimed westerly boundary. Neither the evidence nor the inferences to be drawn therefrom compelled the chancellor to comply with these requests. Indeed, they were immaterial to the issue presented and for this reason alone they were properly denied. *Phillips* v. *Plastridge,* 107 Vt 267, 271, 179 A 157, 99 ALR 1074.

An exception was taken to that part of the concluding finding wherein the chancellor states that he is "unable to find by the requisite measure of proof that there was any mistake on the part of the defendants in regard to the terms. conditions or stipulations

embraced in the agreement . . . or that the defendants were under any mistake that occurred through no fault of either party to the agreement or that occurred through no fault of the plaintiffs, but through the negligence and inattention of the defendants."

The burden of establishing the mistake alleged rests upon the defendants, since they have set it up as an affirmative defense and as a ground for relief. *Houran* v. *Preferred Acc. Ins. Co.,* 109 Vt 258, 271, 195 A 253. The measure of persuasion is proof beyond a reasonable doubt. *Ward* v. *Lyman,* 108 Vt 464, 467, 188 A 892, and cases cited. This does not mean that the evidence must be such as to strike all minds alike or that it must not be contradictory. *Fife and Child* v. *Cate and Cate,* 85 Vt 418, 427, 82 A 741. Where there is clear, distinct and substantial evidence bearing upon the issue, the degree of certainty which it implants in the mind of the trier is for him alone, and we can interfere with his finding upon the subject only where the evidence and the inferences to be drawn therefrom in support of it are so slight and inconclusive in character that it can be said as a matter of law that he has erred in his estimate of their strength. *Ward* v. *Lyman,* 108 Vt 464, 468, 188 A 892; *Dundon* v. *Waldron's Admr.,* 114 Vt 312, 316, 44 A2d 156.

It clearly appears that the chancellor was fully aware of the degree of proof required to establish the existence of a mistake on the part of the defendants of a nature sufficient to discharge them from their bargain. The statement that he is "unable to find by the requisite degree of proof" is equivalent to an affirmative finding for the plaintiffs. *Partridge* v. *Cole,* 98 Vt 373, 377, 127 A 653. Although, as we have seen, it does not necessarily mean that there was no evidence to substantiate the defendants' claim, it imports that such evidence, in his judgment, did not convince him beyond a reasonable doubt, and therefore, in a legal sense, he was unable to make a finding in accordance with it. *Scott's Admr.* v. *Beland,* 114 Vt 383, 387, 43 A2d 641; *Haskins* v. *Haskin's Est.,* 113 Vt 466, 470, 35 A2d 662; *Miller* v. *Rossier,* 107 Vt 479, 482, 181 A 105, and cases cited. The contrary not appearing, we must assume that he considered all the pertinent facts and circumstances in reaching his conclusion, (*Putnam* v. *Woodward,* 111 Vt 39, 43, 10 A2d 186; *Patch* v. *Squires,* 105 Vt 405, 410, 165 A 919; *Farmers Exchange* v. *Lowney Co.,* 95 Vt 445, 452, 115 A 507), and that he examined the evidence with impar-

tial patience and adequate reflection with the deliberate result embodied in his finding. *Guibord* v. *Guibord,* 114 Vt 278, 283, 44 A2d 158; *Domina* v. *Pratt,* 111 Vt 166, 177, 13 A2d 198; *Platt, Admx.* v. *Shields and Conant,* 96 Vt 257, 269, 119 A 520.

The Court of Chancery will lend its aid in the rescission of a written agreement where one party thereto has entered into it under a mistake as to the facts upon which it was based or as to the terms and stipulations embraced therein, such mistake not having arisen through the fault of either party, but where the mistake has resulted solely from the negligence or inattention of the party seeking relief, the other being without fault, relief will be refused except under very strong and extraordinary circumstances showing imbecility or something that would make it a great wrong to enforce the agreement. *Ward* v. *Lyman,* 108 Vt 464, 471-2, 188 A 892; *New York Life Ins. Co.* v. *Kimball,* 93 Vt 147, 153, 106 A 676. If the contract was untainted by fraud, bad faith or misrepresentation, it is not enough merely to show that it was improvident, or has resulted in hardship. *Allen* v. *Hayes,* 309 Ill 374, 144 NE 188, 190; *Yanko* v. *Goldberg,* 101 N. J. Eq. 170, 137 A 645, 646; and see cases cited annotation 65 ALR 75 ff.

The mistake alleged by the defendants is two-fold: (1) that when Joseph Cimonetti saw the name "Tetreault" in the agreement he understood and believed that it did not refer to the line between the lands of Tetreault and Sanford, which the agreement designated as the point at which the boundary between the lands of the parties should be surveyed in a westerly direction, thus marking the southern limit of the plaintiffs' property, but to a bridge across Hubbard Brook, situated some distance north of the Tetreault-Sanford line, and known as the Tetreault bridge, which he testified had been pointed out to him as his corner when he bought his property; and (2) that both defendants, who understood that their original parcel contained between fifty and sixty acres, expected to surrender to the plaintiffs, under the agreement, only seven or eight acres, whereas the evidence tended to show that the amount thereby allotted to him was about thirty-five acres, in addition to the sixteen acres more or less as described in his deed.

The findings, which in this respect are unchallenged, show that the defendants executed the agreement voluntarily and that there was no fraud, deceit or imposition on the part of the plaintiffs. It is true that they are uneducated and that neither of them is able to

read English too well, but the transcript shows that both understand the language and speak it with considerable fluency. At the first meeting of the parties and their attorneys on the land the plaintiffs' attorney drew a rough sketch of the proposed Cimonetti parcel, which the parties looked over and discussed. Throughout the course of negotiations, until the signing of the agreement, the defendants were represented by a lawyer whose ability and fidelity to his clients' interests is unquestioned. He warned Joseph that he might be disappointed at the outcome of the proposed arrangement. After the agreement had been prepared and signed by the plaintiffs he sent it to the defendants, with a covering letter. Not having heard from them he wrote to them again about two weeks later. Meanwhile the defendants kept the agreement and discussed it only with Stebbins, who said, in substance, that it would be all right for them to sign, and they did so. Joseph testified: "I got disgusted and signed." During the two weeks and more in which the agreement was in their possession any advice or explanation the defendants might have desired was available to them by consultation with their attorney. The fact that they did not take this course, when they could have done so, was a circumstance for the chancellor to consider upon the issue of their negligence or inattention. See *Nickerson* v. *Bridges,* 216 Mass 416, 421, 103 NE 939.

It is true that the deed of the lot owned by the plaintiffs called for an estimated sixteen acres more or less, and the addition of the land allotted to them by the survey caused it greatly to overrun this amount. But this is beside the point. The evidence is to the effect that the defendants wanted only fifty acres as their share, and this is the testimony not only of Joseph, but of several other witnesses who heard him make the statement. This amount, exclusive of highways, was set out to them by the survey. Whatever may have been the expectation of the parties as to the extent of the disputed land remaining over and above this acreage, which none of them knew, the agreement was drawn in this respect exactly in accordance with the defendant's expressed desire. "When parties have entered into a contract based upon uncertain or contingent events, purposely as a compromise of doubtful claims arising from them; or where parties have knowingly entered into a speculative contract, that is, one in which they intentionally speculated as to the result; and the facts upon which such agreement was founded, or the event of the agreement itself, turn out very different from what

was expected or anticipated, this error, miscalculation, or disappointment, although relating to matters of fact and not of law, is not such a mistake, within the meaning of the equitable doctrine, as entitles the disappointed party to any relief by way of defeating or rescinding the contract; in such classes of agreements the parties are supposed to calculate the chances, and they certainly assume the risks." Pomeroy on Specific Performance, 3rd Ed. § 239. From the facts found and certified to us it is fairly inferable that the agreement here in issue came within one or the other of the classes described in the above quotation and therefore we will assume in support of the decree that the inference was drawn by the chancellor. *Duchaine* v. *Zaetz,* 114 Vt 274, 277, 44 A2d 165; *Burlington Bldg. and Loan Association* v. *Cummings,* 111 Vt 447, 452, 17 A2d 319; *Myott* v. *Vermont Plywood Co.,* 110 Vt 131, 134, 2 A2d 204; *Miller* v. *Rossier,* 107 Vt 479, 482, 181 A 105; *Reed* v. *Whitham,* 107 Vt 482, 483, 486, 181 A 129.

In view of the unchallenged findings and the evidence above mentioned it cannot be said as a matter of law that it was proved beyond a reasonable doubt that the defendants were under a mistake which was not due to their own negligence and inattention or that the circumstances were so strong and extraordinary that it would make it a great wrong to enforce the agreement. The exception is not sustained.

In this connection the defendants have briefed exceptions to the refusal to comply with their requests that the chancellor should find that Cimonetti understood that under the agreement he would convey no more than ten acres and that he was dissatisfied with the survey because it gave the plaintiffs approximately thirty-five acres. These findings would be material only on the ultimate question of mistake and as that was disposed of by a finding supported by evidence adverse to the defendants' claim, they became immaterial and their denial was harmless. *Crampton* v. *Lamonda,* 95 Vt 160, 164, 114 A 42.

■ During the trial, and before the plaintiffs' evidence had been completed, the defendants moved to dismiss the petition because it was not established that the survey had been commenced at the agreed corner and because the map had not been prepared as required. The motion was denied, subject to exception. In this there was no error. The motion was premature, since it was made before the findings of fact were prepared and filed. *Butler* v. *Mil-*

*ton Co-op. Dairy Corp'n.,* 112 Vt 517, 519, 28 A2d 395, and cases cited. *Levin* v. *Rouille,* 110 Vt 126, 129, 2 A2d 196. It was not renewed thereafter. But, as we have seen, there was evidence supporting the finding as to the place of commencement of the survey, and also justifying the refusal to make the requested finding as to the map.

██ A petition for specific performance is addressed to the sound judicial discretion of the court of chancery, which is to be exercised in conformity with established principles and rules. *Bufton* v. *Crane,* 101 Vt 276, 280, 143 A 382; *Gove* v. *Gove's Admr.,* 88 Vt 115, 118, 92 A 10, and see cases cited Annotation 65 ALR 8-26. Unless some unusual situation exists, specific performance will be decreed almost as a matter of course. *Gove* v. *Gove's Admr. supra*; see also *Fowler* v. *Sands,* 73 Vt 236, 237, 50 A 1067; *Adams* v. *Patrick,* 30 Vt 516, 521. Since the granting of relief lies in the court's discretion, the result can be revised only where an abuse thereof clearly and affirmatively appears. *Lariviere* v. *Laroque,* 105 Vt 460, 471, 168 A 559; *Parizo* v. *Wilson,* 101 Vt 514, 523, 144 A 856. The recognized test is whether the court has exercised its discretion on grounds or for reasons clearly untenable or to an extent clearly unreasonable. *Stone* v. *Briggs,* 112 Vt 410, 415, 26 A2d 828, and cases cited.

Although no question has been raised as to the sufficiency of the findings to support the decree, the record of this cause has been carefully examined with the result that no abuse of discretion in granting the relief sought has been made to appear.

*Decree affirmed.*