Vermont Superior Court
Filed 12/15/23
Lamoille Unit

VERMONT SUPERIOR COURT

Lamoille Unit
154 Main Street
Hyde Park VT 05655
802-888-3887
www.vermontjudiciary.org



CIVIL DIVISION
Case No. 21-CV-02400

---

Kiel Ingalls v. Miranda McAllister

---

## FINDINGS, CONCLUSIONS, AND JUDGMENT

The present case began as a partition action by Plaintiff Ingalls sought to divide property co-owned between himself and Defendant McAllister. The facts as they have developed through litigation and hearings have revealed a more complicated and very human tale involving the rise and fall of a couple that now seeks to divide their assets in the wake of a final split.

The Court has already issued extensive decisions summarizing the background of the parties' relationship and dispute as well as the procedural history of this particular action. Following an October 3, 2023 bench trial, the Court finds the following.

In 2015, Ingalls and McAllister began a romantic relationship that eventually led them to move in together and to start a family. In a short period of time, they were looking for stable housing, but they were unable to find something immediately within their price range.

McAllister's parents purchased 1033 Crooks Road in Eden, Vermont in 2018 with the express intent of selling it to Ingalls and McAllister to provide them and their child with a safe and stable home. Following the purchase McAllister's parents, McAllister, and Ingalls did extensive work and renovations to the house and property to make it habitable. Importantly, this work was done while McAllisters' parents owned the property. The evidence indicates that McAllisters' parents picked up the majority of the costs of these repairs and improvements but that everyone participated and contributed to the rehabilitation of 1033 Crooks Road, including landscaping and installation of exterior buildings. In 2019, Ingalls and McAllister and their child moved into the house and began occupying it as a family. At that time, they paid rent to McAllister's parents, and there was no formal agreement in place to purchase the property or apply the payments to a purchase. Instead, the parties had an oral agreement with McAllister's parents to have the first opportunity to purchase the property.

In 2020, Ingalls and McAllister purchased 1033 Crooks Road from McAllisters' parents for $155,000. The purchase was made with a bank loan secured by a mortgage on the property and closing costs covered by the Vermont Housing Authority in a grant for first-time homebuyers. Following their purchase, the couple created a joint bank account where each party put funds to cover the costs of maintaining the house and property, particularly the monthly mortgage payments. As part of this transaction, the property was appraised at $169,000.

At first, the parties lived in harmony at the property, which fulfilled their expectations. It was a safe and stable environment for them and their child. Ingalls was the primary breadwinner for the family and McAllister provided more of the childcare and domestic support. There is no evidence that the parties made any further, substantial improvements to the property, but both contributed to its on-going maintenance and upkeep. At the time, Ingalls was contributing the bulk of his wages to the parties' joint account as was McAllister who continued to work part-time throughout these events.

Domestic bliss, unfortunately, was short lived in the household. Ingalls and McAllister began having disputes, and the relationship significantly weakened. In late 2020 and early 2021, the two were engaged in couples counseling. During this time, it became apparent that a break-up was eminently possible. Within this larger emotional conversation, there was the practical issue of the house. On April 21, 2021, the parties signed a short agreement where Ingalls agreed to transfer the house to McAllister in the event of a break-up and that in return McAllister would re-finance and remove Ingalls from the mortgage.

At the time, the parties performed no additional appraisals for the property and had no reason to understand that it was worth more than the prior appraisal of $169,000.[1] The parties had also only made only a dozen monthly mortgage payments, which as preliminary mortgage payments would have been more interest than principal, leaving most of the $155,000 mortgage pending against the property.

_____

[1] Ingalls testified that he subjectively believed the property was worth $200,000 in April 2021. There is no evidence to support this statement either in objective terms of an additional appraisal or other property valuation or a contemporaneous statement to show that he truly believed that the property had gained over $30,000 in value within a year of the last appraisal. Ingalls does not a background in real estate, appraisals, or similar wok that would have given him more than a subjective belief, and the evidence indicates that to the extent that he held such a belief, it was kept silent until well after the Agreement formation and McAllister's earliest efforts to enforce it. As such, the Court finds that the testimony is neither credible nor compelling. The hard fact at the time was that the parties could only reasonably believe that each had about $7,000 in equity in the house ($169,000 minus $155,000 divided by 2). While subsequent events in the marketplace have given rise to inflated real estate prices in Vermont, there is no evidence that the parties were aware that this applied to their property in April of 2021 or that a bank or lending institution would recognize such belief.

*The April 2021 Agreement*

The April 2021 Agreement does not speak to any further price or transfer of equity. It does not provide for such but it also does not indicate that these issues were to be reserved to a future date. It simply speaks of assigning ownership of the home, in the event of a break-up, to McAllister, subject to her ability to secure refinancing and to discharge Ingalls from the obligations of the mortgage. Ingalls, in his pleadings, argues that the Agreement is ambiguous on the issue of equity, and the silence should be interpreted as an omission of this issue to be resolved or as a failure to address it as his subjective expectation was that the eventual refinancing would include an amount that represented a payout of his equity.

Ingalls interpretation is only justified if the Court finds the April 2021 Agreement ambiguous or that it omits the issue of equity. The latter would make the Agreement effectively incomplete as it would only cover the issue of who got title to the house (McAllister) and detail her obligation to have Ingalls discharged from the mortgage, leaving to another day and another agreement issue of what price it would take to finalize this agreement. This second interpretation does not make sense on its surface. When two parties co-own property and are both on the mortgage, it is impossible to remove one of them from the title but not the mortgage. In most mortgages, this would create a potential default, and practically, it would be of no effect, as the individual remaining on the mortgage would be tied to the property until discharged. In this respect, assigning the property to one of the parties requires that they find a way for the other to be discharged from the mortgage. To discharge the other from the mortgage in this case will require one of the parties to obtain a new mortgage. That means obtaining new financing. In such situations, banks lend only certain amounts of money, if the expectations of the parties was that the re-financing would include additional money to pay the discharged owner, the lack of such information would render the Agreement effectively unenforceable as McAllister could not refinance without a specific number, if that number was larger than the balance on the mortgage, than it would effectively render the Agreement ambiguous and unenforceable as she could not re-financing until that number was established and could not, in effect, obtain a discharge of the mortgage or remove Ingalls from the mortgage or deeds.

That means either the April 2021 Agreement did not include any terms or references to equity or payouts to Ingalls because the parties did not at that time intend such as part of the transfer, or because the Agreement was not complete and was ambiguous about its terms. The threshold test of whether a contract is ambiguous requires the Court to look to the circumstances around its formation.

*Isbrandtsen v. N. Branch Corp.*, 150 Vt. 575, 577 (1988).  In this case, after hearing the parties' evidence and testimony, the circumstances surrounding the April 2021 Agreement support an interpretation that the parties intended this Agreement to be a complete and final agreement about the allocation of the house and property at 1033 Crook Road.  The Court does not find that the parties reserved any issue of equity to further agreement or intended to do so.

This is for a variety of reasons.  First, the 2021 Agreement was formulated at a period when the parties were aware that a break-up was a likely outcome of their situation.  This was not a theoretical possibility.  It was where events were headed.  Therefore, the Agreement needed to cover the parties' next steps in a final and conclusive manner that would enable them to take steps to effectuate it.  While it appears that Ingalls held out greater hope for reconciliation, the writing was on the wall for both parties.

Second, the idea of equity in the home was not a primary consideration at the time of formation.  The parties had only owned the home for a year.  The work that they put into the house had occurred before the purchase and was reflected in the purchase price.  As owners at the start of the mortgage, the parties were unlikely to have created significant equity by either their limited number of mortgage payments or the pre-purchase renovations that were done to make the property habitable.

Third, there was the mortgage.  Prior to the assistance of McAllister's parents, the couple had not been able to find a house that they could afford.  It was a significant concern that with the parties that after splitting neither would be able to afford the property without contributions from the other or support from their extended families.  This put refinancing front and center and gave Ingalls a benefit if it could be realized in discharging him from the obligation without further liability.

Finally, there was the concern that had driven the parties in the first place, stable and secure housing for their child.  Resolving the home ownership issue with a discharge of Ingalls from the mortgage would, if possible, keep McAllister in the house with their child and keep their housing stable.

For these reasons, the Court finds that the circumstances surrounding the formation of the April 2021 Agreement are not only dispositive in terms of allocating ownership of the home and property to McAllister but also show that there was no ambiguity in the Agreement regarding its completeness or function.  Under the terms of the Agreement, McAllister is to obtain refinancing that discharges Ingalls.  Upon securing this, Ingalls shall sign over his interest in the property, freeing him and his

credits from any further obligation and leaving the burden of the bulk of the mortgage to McAllister to navigate. The effect of this Agreement was for Ingalls to waive what limited equity was available at the time of formation in favor of the consideration of discharge from liability and preservation of the house for his child.[2]

### *The May 2021 Break-Up and Subsequent Events*

Around the time of the April 2021 Agreement, McAllister took steps to file a formal parentage action. Such an action would not only create a formal legal recognition of parental rights in both parties, but it was the first, necessary step to determine issues of custody if the parties were to break-up. At the same time, Ingalls continued to live with McAllister, and the two continued to seek counseling and made efforts to keep the relationship together. The Court finds that the evidence indicates both parties approached this process in good faith. While McAllister appears to have been more pragmatic, taking steps to secure the alternative, it does not appear that she did so to undermine any particular efforts at reconciliation and repair. Ingalls, for his part, appears to have valued this relationship and the family that he had created. While the Court need not make findings beyond this, it will nevertheless note, that both parties demonstrated in their testimony, a consistent commitment to their child and to their prior efforts to make their relationship work.

This is not to say that the relationship between McAllister and Ingalls were amicable or improving, much the opposite. As the testimony indicates, the tension and disfunction that was evident in April only worsened in the following month. In fact, tensions in the household hit a fever point. In May, McAllister filed a petition for a Relief from Abuse, which the Court granted.[3] As part of this Order, Ingalls was directed to vacate the residence, and this effectively terminated his occupancy of 1033 Crooks Road, which has continued throughout the present litigation. At the time of the RFA, the parties were still engaged in counseling, and McAllister had not sought to act on the April 2021 Agreement by obtaining refinancing or taking ownership of the property as one of the terms of the

---

[2] Ingalls notes that it is also true that given the likely shared custody that he would need to be able to provide a safe and stable place for their child. This is absolutely true, but it is not unreasonable for the parties to need to first preserve what they had, which was the 1033 Crooks Road property. For the parties' child, this was home and ensuring that it remained a safe and stable home was a shared valued that the Court has no difficulty finding based, in part, on the testimony that both parties credibly offered about their love and support for their child.

[3] The Court finds no reason to dispute or disturb the findings of the earlier RFA, although its findings and existence do not go to the claims or equities at issue in the present matter, which is limited to interpretation of the April 2021 contract and a determination of what if any money or objects are owed to either party.

Agreement is that such distributions would only trigger if the parties' relationship ended. The May RFA order marked the end of the parties' relationship.[4]

Following the break-up, McAllister followed the terms of the April 2021 Agreement. She sought refinancing, which she obtained in early 2022 and sought specific performance. In the time leading up to this deed, the relationship between the parties had deteriorated and with a bump in the market, Ingalls' initial feelings about greater value and equity had grown. As the dispute between the parties grew to encompass other items and issues, Ingalls refused to comply with the Agreement and sought legal action. In August of 2021, he filed the present action for partition. McAllister filed a counterclaim seeking specific performance of the April 2021 Agreement and the return or assignment of personal items. McAllister has also testified that she has obtained refinancing and is ready to obtain a discharge once Ingalls deeds his interest to her.

*Specific Performance of the April 2021 Agreement*

Based on the findings above, the Court concludes that McAllister is entitled to specific performance. The evidence shows that the parties formed a valid agreement in April 2021 concerning the allocation of the house between the two parties in the case of a break-up. The terms of the Agreement assign the property to McAllister so long as she can obtain refinancing and obtain a complete discharge for Ingalls from the mortgage and its obligations. The evidence at trial is that McAllister has obtained this refinancing and is prepared to execute once Ingalls signs his interest over at a closing. As the Court previously noted, the remedy of Specific Performance "will be decreed almost as a matter of course. Since the granting of relief lies in the court's discretion, the result can be revised only where an abuse thereof clearly and affirmatively lies." *Sparrow v. Cimonetti*, 115 Vt. 292, 304 (1948); see also *Jasmin v. Alberico*, 135 Vt. 287, 289 (1977). Given the Court's findings, it is now proper and appropriate to Order Ingalls to sign his interest in the 1033 Crooks Road property over to McAllister at a closing where he is fully discharged from any and all mortgage obligations. To the extent that subsequent events have created additional equity in the property, Ingalls is not entitled to re-make his agreement with McAllister. *Villeneuve v. Bovat*, 128 Vt. 345, 348 (1970) ("Disappointment in the outcome of a bargain will not excuse performance of an agreement to convey.") (citing *Sparrow*, 115 Vt. at 301–03, (1948)).

---

[4] There was some questioning at trial as to what the terms "breaking up" meant. While there is certainly an argument that intermediate steps like moving to separate beds or taking off an engagement ring might not be enough to signal the end, the Court has no problem finding that the RFA Order and the resulting split between the parties reasonably constituted a "break-up" in any sense of the term.

Therefore, judgment is granted to Defendant McAllister on the issue of specific performance, and the Court directs that the parties complete this closing as soon as possible following this decision becoming final.[5] .

*Financial Compensation*

Given the Court's findings there is no basis for further financial award to Ingalls concerning the equity of the property as the Court finds that there was no intent to reserve the issue of equity to a subsequent agreement. The Court has also previously issued orders explaining why unjust enrichment claims do not apply so long as there is a contract in place. See RESTATEMENT (THIRD) OF RESTITUTION § 28, cmt. b ("While a perception of unjust enrichment may aid the contention that a contract had been formed between the parties, any recovery based on contract is outside the rule of this section."); see also Id. § 2 (2) ("A valid contract defines the obligations of the parties as to matters within its scope, displacing to that extent any inquiry into unjust enrichment.").

Beyond the question of a right to any compensation for equity accrued at the time of the Agreement, the parties also presented evidence that each side claims demonstrates some further right to compensation. Ingalls notes that the mortgage and maintenance of the property continued to be paid out of a joint account that he contributed to up and until June 2021. He seeks compensation from this account for the two months that he did not live at the property. McAllister similarly seeks compensation both for the narrow costs of maintaining the house following Ingalls departure and subsequent refusal to release the deed, as well as her costs and expenses in defending this right to specific performance. The Court finds that the amount sought by Ingalls to be relatively small and is more than offset by the delay that has been created. In many ways the analysis would expand to Ingalls' pre-RFA payments as well.

The evidence demonstrates that McAllister has not been unjustly enriched by the any mortgage or maintenance payments that Ingalls made following the RFA or before their break-up. Both parties lived in the house and enjoyed the benefit of it. While not married, they behaved like a married couple. So while Ingalls may have been the primary income provider, he was not the sole provider and McAllister can point to other contributions that were part of the common cause that they pursued.

---

[5] While the Court will issue a final judgment order, this decision is a final resolution of the parties' issues and disputes. Nevertheless, the parties should be aware that there is a 30-day window in which motions to reconsider and notices of appeal may be filed.

Together these considerations disfavor any further payments or re-distributions from McAllister to Ingalls.

On the other side, the Court finds no unjust enrichment or right to compensation to McAllister for either the costs of maintaining the house after Ingalls left, ore related to the costs of refinancing, or to legal fees incurred. Despite the rhetoric, the Court finds no grounds under the case law to suspend the American Rule governing legal fees, which requires each side to bear their own. *D.J. Painting, Inc. v. Baraw Enterprises, Inc.*, 172 Vt. 239, 246–47 (2001) (requiring bad faith constituting outrageous conduct to warrant an award of attorney's fees). Therefore, the Court declines to award any damages to McAllister in this matter.

*Miscellaneous Items*

The last remaining issue in this case is distribution and assignment of various personal items that the parties seek to be returned or made available to them. These claims were premised on claims arises either from equitable ownership or a similar equitable claims since the evidence for ownership in each case was either unclear or joint. The limited financial value of these items suggests that a straightforward disposition of ownership is likely to be most just as no one object listed below is likely worth the amount of costs required to establish more detailed ownership and title history.

Ingalls has asked for the following items:

a. A shed moved onto the property, which Ingalls testified has a $500 value

b. The $200 value of a freezer that he purchased.

c. An ATV that his mother gifted to him.

d. A cooler

e. A woodstove

f. Toy bench

g. Turkey Fryer

h. Wooden Snowshoes.

The Court finds that Ingalls is entitled to items c–h. McAllister shall make these items available to Ingalls by either placing them in a secure location where he can pick them up or by delivering them

to a location of Ingalls designation. As to items a and b, the Court awards these items to McAllister, but finds that Ingalls is entitled to the $700 compensation sought. This amount may be paid at the closing that has been ordered in the prior section under specific performance.

McAllister seeks the following items:

a. Diamond engagement ring.

b. Keys to the House.

c. Cooler

d. Wheelbarrow

e. Grill

f. Garden Hose

g. Picnic Table

h. Tools

The Court awards McAllister items c–h, which are at the 1033 Crooks Road property and do not need to be returned. As to items a and b, Ingalls testified that he did not have either item. The diamond ring went missing shortly after Ingalls left the house, but there was no evidence directly linking him to the loss or removal of the ring. McAllister claims to have left it in a drawer, but there is no proof that Ingalls knew the location of the ring or removed it from this location. Similarly, Ingalls claims that he has returned all keys to the house, and there is no evidence to the contrary. The Court finds that McAllister is entitled to both the diamond ring, which the parties purchased with McAllister's parents' money, and to the keys. To the extent that Ingalls has or finds either keys or the ring among his possessions, he is directed to return them to McAllister.

## **ORDER**

Based on the foregoing, judgment is granted to Defendant McAllister on the issue of Specific Performance, and Plaintiff Ingalls is directed to cooperate with McAllister to set up a closing date where he will execute a deed transferring ownership of 1033 Crooks Road to McAllister in exchange for a full and complete release from the mortgage and note obligations to which he is a party and that currently bind him to the property. The Court rejects any claims by Ingalls to equity in the property or payments for this transfer. The Court also rejects the parties' claims to compensation related to their

joint bank account and any delays in refinancing arising from the course of this litigation and Plaintiff Ingalls' refusal to deed his interests in the property prior to this Order. Finally, the Court awards the parties personal property consistent with this Decision and directs McAllister to pay Ingalls $700 for the shed and freezer that he purchased and will be leaving on the property. McAllister as the prevailing party is entitled to her court costs under Rule 58. Plaintiff shall submit the court costs and services fees incurred in this matter, and the Court shall prepare and issue a final judgment.

**So Ordered.**

Electronically signed on 12/15/2023 5:26 AM pursuant to V.R.E.F. 9(d)

_____

Daniel Richardson
Superior Court Judge